# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

ANDRE BLAAUW                                    *CIVIL NO. 06-1380

VERSUS                                          *MAGISTRATE JUDGE HILL

SUPERIOR OFFSHORE                               *BY CONSENT OF THE PARTIES
INTERNATIONAL, LLC

## REASONS FOR JUDGMENT AND MEMORANDUM RULING

The non-jury trial of this case before the undersigned Magistrate Judge commenced on

February 19, 2008 and concluded on  February 26, 2008.[1]  Following several extensions, the

parties were given until April 11, 2008 to file post-trial briefs.  Thereafter,  the Court took this

case under advisement.

## STIPULATIONS

The Pre-Trial Order contains the following joint stipulations:

1.  At all relevant times herein, Superior Offshore International, LLC was the
owner and operator of the DSV Superior Endeavor;

2.  That plaintiff, Andre Blaauw, was making a saturation dive at the time of his
accident;

3.  That plaintiff, Andre Blaauw, was working on the DSV Superior Endeavor at
the time of his accident;

4.  That plaintiff, Andre Blaauw, was a native and resident of South Africa at the
time of his accident;

---

[1]All parties consented to the Court's jurisdiction being exercised by the undersigned pursuant to 28 U.S.C. § 636(c).

5. That plaintiff, Andre Blaauw, was working in the Gulf of Mexico at the time of his accident;

6. That plaintiff, Andre Blaauw, sustained a permanent injury to his left eye on June 16, 2006, while in the diving bell deployed from the DSV Superior Endeavor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After due consideration of the facts and evidence which was presented by the parties at the trial of this matter through live witnesses, exhibits and deposition testimony, and having had the opportunity to assess the demeanor of the live witnesses, and review and weigh the evidence, this Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, which the Court finds and holds were established by a preponderance of the evidence.[2]

### FINDINGS OF FACT - Liability

On June 16, 2006, plaintiff, Andre Blaauw ("Blaauw"), a 26 year old South African commercial diver and Jones Act seaman, was employed as the borrowed servant of the defendant, and proper Jones Act employer, Superior Offshore International, LLC ("Superior") as a saturation diver.

On June 16, 2006, Blaauw was injured, through no fault of his own, by the negligence of Superior and the unseaworthiness of Superior's Dive Support Vessel, the DSV Superior Endeavor, for which he is entitled to damages.

---

[2]To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

The Court finds Blaauw to be a pleasant, honest, straightforward and credible witness. He is exceedingly polite and deferential; he appeared to be honest and diligent in attempting to respond to questions posed by counsel and the Court. The Court therefore accepts Blaauw's testimony with regard to the factual details of his accident and the extent of his resultant injury and damages.

As is more fully set forth and explained below, the Court finds that at the time that Blaauw was injured, he and his dive partner, Brian Trice ("Trice"), had just completed almost eight hours of work and a diver recovery drill (which took over an additional hour to complete), in excess of the time permitted for two-man bell runs set forth in Superior's diving manual. Blaauw was physically fatigued. Trice was standing opposite Blaauw in the crowded and cramped diving bell, with his back to the light casting shadows and blocking the light's distribution throughout the entirety of the bell. While Trice was bending over attempting to close the hatch, Blaauw was also bent over looking toward his feet clearing the area around the rim of the hatch and O-ring to ensure a good seal of the hatch. Neither Blaauw nor Trice saw a bungee cord hanging freely around the hatch before Blaauw was injured, and there is insufficient evidence in the record to support a finding that Blaauw left the bungee cord which struck him hanging freely. As Trice was lowering the hatch, the hatch snagged the bungee cord. When the bungee cord came free, it snapped back and struck Blaauw in the left eye.

At the time of his injury, Blaauw was aboard Superior's Dive Support Vessel, the DSV Superior Endeavor. The vessel's four man saturation system was composed of decompression

chambers, a living chamber, a transfer chamber and a submersible diving bell.  The diving bell is the means by which saturation divers are deployed from the decompression (living) chambers on the vessel to the divers' work site at depth.

The Superior Endeavor Class III diving bell was a two man "roll over" type bell which measured 65 inches in diameter.  Hence, average size men, such as Blaauw and Trice, could not stand fully upright inside the bell.

The bell hatch weighed approximately 150 pounds, was approximately 28 inches in diameter and permitted a 24 inch man-way opening.  When mated to the vessel, the hatchway lies horizontally; when the diving bell is unmated from the system, the bell is "rolled over" so that the hatchway lies vertically, allowing the divers to "drop down" through the hatchway into the water.  When the hatch is fully opened, the hatch extends into the interior of the bell approximately 45 inches. Moreover, when the hatch is in the open position, much of the space behind the hatch is basically inaccessible.  When closing the hatch, a diver would have to brace himself against the hull of the bell while bending over, and then bend over further as the hatch was lowered.

In addition to the area taken up by the hatch while in the open position, the interior of the diving bell also contained approximately 200 feet of the main diver's umbilical hose.  There was also a panel which took up room inside the bell because it had a standoff distance from the hull of the bell of approximately four inches. Moreover, the bell contained a fan mounted with a canister, a reclaim system running through a water trap and a spare canister.  A main diver's

helmet and a standby diver's band mask were also inside the bell. Additionally, a medical kit, toolbox, and water in a two gallon container were stored in the bell. Thus, the Court finds that the interior of the bell was cramped and crowded, and even more so when both divers were inside the bell at the same time.

While the bell could have accommodated two lights, at the time of the accident herein, the interior of the diving bell was equipped with a single light which was offset from the top center of the bell to the stern (aft) or back side of the bell. Although the parties dispute the exact location of the light from the top center of the bell, from the live demonstrations presented to the Court, as well as the testimony of both Blaauw and Trice, the Court finds that when a diver is attempting to close the hatch for the journey topside, as Trice was doing at the time of Blaauw's accident, while another diver is present within the bell, shadows are cast creating shade in areas of the bell making those areas very dark. The diver's body, in essence, blocks the light's distribution throughout the entirety of the bell, resulting in dimly lit areas of the bell and obstructed views. The Court therefore accepts Blaauw's testimony that he had difficulty seeing behind the hatch, as that area was very dark, but that if a second light had been installed, it would have illuminated the area near or behind the hatch, perhaps enabling him to see a bungee cord dangling there, as highly credible.

Bungee cords were present in the diving bell, having been placed there by Superior personnel for use by the divers inside the bell. These cords were used to secure equipment such as the sodasorb container, medical kit and the standby diver's hat, to hold the umbilicals

against the hull and, on occasion, to hold the hatch back, uses of which Superior was well aware. Indeed, Ken Fechtler, Superior's saturation diving supervisor, testified that prior to Blaauw's accident, he was aware that bungee cords were being used for multiple purposes within the dive bell. However, these bungee cords were not listed as standard equipment of the dive bell and were not listed on either the internal or external bell checklists. Hence, there was no procedure to determine if the bungee cords were broken, corroded or otherwise defective or deteriorated, and there was no maintenance records for the cords used in the dive bell.

William Bratkowski, Superior's safety manager, testified that bungee cords are inherently risky because of the stored energy in the cord when the cord is extended. Moreover, both Bratkowski and Fechtler admitted to hazards associated with bungee cords in dive bells, including the hazard that they may hook onto a diver's gear, hoses or the hatch. These dangers are not only obvious to the Court, but also had been recognized as early as 1997 in a published paper and a May, 2000 IMCA published safety flash. Bratkowski further confirmed that in saturation it is important to eliminate equipment which could be unsafe so that no one gets hurt. However, no Job Safety Analysis (JSA) was ever performed regarding the use of bungee cords in this crowded dive bell.

Had a JSA been performed, the hazards associated with the use of bungee cords in this crowded, dimly lit dive bell would have been revealed, thereby potentially preventing Blaauw's accident, by requiring storage of items secured by bungee cords in a uniform way, or by

dispensing with bungee cords altogether. The Court credits and accepts the testimony of plaintiff's liability expert, Rickey Dean Walker, with respect to this point. Indeed, it is undisputed that immediately following Blaauw's accident, at the direction of Superior's dive superintendent, Brad Boerner, the bungee cords were removed from Superior's dive bell and the use of those cords was discontinued. The removal of the cords was done despite the fact that no root cause analysis was done after Blaauw's accident. The purpose of a root cause analysis would have been to make findings and recommendations to prevent a recurrence. The Court finds it highly suspicious that no root cause analysis was done after this serious accident.

Even though no root cause analysis was ever done, Ken Fechtler testified that when he found out that divers had reintroduced bungee cords into the bell following Blaauw's accident, he instructed the divers to remove them once again.

While there are no rules, regulations or standards prohibiting the use of bungee cords in saturation diving bells, the ADC Consensus Standards for Commercial Diving and Underwater Operations set forth minimum standards below which no company should operate; they do not provide a substitute for common sense or sound judgment. Given the stored energy existing in a stretched bungee cord, and the obvious likelihood of rapid recoil in the event a stretched cord is inadvertently released, common sense and sound judgment dictate that bungee cords should not have been used in the confined and cramped, dimly lit space existing in Superior's dive bell. That is the case notwithstanding that such devices were apparently commonly used in the industry, and notwithstanding the fact that no accidents had previously occurred as a result of

Superior's use of bungee cords in dive bells. That is particularly the case since a cheap and safer alternative, line or rope, was readily available.

Blaauw, his bell partner Trice, and two other divers locked into saturation on May 26, 2006. Two man dive teams alternated bell runs. Blaauw was partnered with Trice, an experienced saturation diver. This was Blaauw's first time in saturation and the first time he was to perform saturation dives. Although Blaauw had worked around the saturation system during his previous four month hitch on the DSV Endeavor, during which time he got to know the system well, and had received training on the run of gas through the panel in the dive bell prior to his entry into saturation, Blaauw lacked prior practical saturation diving experience. Moreover, Blaauw did not hold a Class I certificate to engage in saturation diving; however, such certification is not required by the ADC for entry into saturation. On June 16, 2006, Blaauw had been in saturation for approximately twenty-one days.

Each bell run is performed by two divers, referred to as a working diver and a standby diver or bellman. The working diver leaves the bell, while the standby diver stays inside the bell in case an emergency arises. Then, after the first working period, or lockout, the two divers exchange places. Blaauw was the initial bellman on the date of his accident. Blaauw was also the last bellman, or standby diver, during the unconscious diver recovery drill, which was performed after the working phase of the bell run was completed.

Before each bell run, both internal and external pre-dive checklists are performed on the bell. The external checklist is performed by the tenders outside the bell, and the internal checklists are performed by the first bellman, or standby diver, with the Superior diving

supervisor.  On completion of the bell run, the last bellman ensures that all equipment is properly stowed before returning the bell to surface.

Superior faults Blaauw for allegedly not securing the standby hat with a bungee cord after completion of the bell run and diver recovery drill.  While Blaauw was the last bell man on the date of his accident, charged with the responsibility of properly stowing his standby hat, Superior did not have a set procedure for stowing the standby hat, nor did Superior have a specific location where the standby hat was supposed to be stowed.

Rather, Blaauw testified that there were three places where divers routinely stowed the standby hat, at their discretion; they could hook the hat over a valve using a loop attached to the top of the hat, place the hat in the coils behind the hatch door, or attach the hat to the hull of the bell using a bungee cord.  He further testified that, after using the hat, the divers normally looped the standby hat over a valve while the divers concentrated on getting a tight seal on the bell hatch.  That is what Blaauw did in this case.  If the standby hat was moved to another position using the bungee cord to attach it to the hull, Blaauw testified that he would not do so until after the hatch was sealed, when there was more room to move inside the bell, before the bell was rolled over onto the cradle.

The Court finds Blaauw's testimony on this point credible.  The bell is not rolled until after a seal on the hatch has been obtained.  The benefit derived from moving the hat and securing it with the use of a bungee cord is gained when the bell is rolled; there would be little or no benefit derived from the use of a bungee cord prior to that time.   In the absence of a

procedure mandating that the standby hat be stowed and secured with the use of the bungee cord in any specific location prior to the time the hatch is closed, Superior's argument fails. Blaauw's decision to hang the standby hat over a valve until the hatch was closed was entirely reasonable, and, significantly, was not restricted by Superior. If Superior believed that the mask should have been immediately secured before the hatch was sealed, it should have adopted a written procedure requiring the band mask to be immediately secured. This it did not do.

When not in use, the bungee cord would hang behind the hatch, where Blaauw testified, and the Court finds, it was out of the way. The bungee cord would remain in the position where the last person to use it had left it. Had Blaauw seen a bungee cord hanging free within the bell in a position where it was not out of the way, he testified that he would have reattached or repositioned it. However, prior to Blaauw's accident, Blaauw testified that he did not see any bungee cord dangling; hence, Blaauw had no reason to reposition or reattach it.

Relying on Blaauw's statement given after his accident, Superior claims that Blaauw did, in fact, see the bungee cord hanging freely in the bell prior to the accident and that he therefore should have reattached or repositioned the cord. At trial, Blaauw explained that in his statement he was summarizing the way he believed he was hurt, but that he had never seen the cord hanging or becoming snagged prior to his accident. A review of the entirety of Blaauw's statement supports that interpretation; on at least two occasions in his statement Blaauw states that he did not see the bungee snagging on the hatch. Moreover, Blaauw's trial testimony is confirmed by the testimony of Trice, who, like Blaauw at trial, testified that he did not see any

bungee cord dangling when he closed the hatch. Additionally, given that the bungee cords were the same color as the umbilicals in the dive bell, Blaauw's failure to see the cord is reasonable and excusable. Thus, the Court finds Blaauw's testimony is credible; Blaauw did not see the bungee cord hanging freely before the accident occurred, he cannot therefore be charged with a failure to reattach or re-stow a cord he never saw, particularly when Superior did not have a written procedure requiring the stowage of the bungee cord in a specific place when the cord was not in use.

Superior also did not have a procedure for closing the hatch, nor did it have a lifting mechanism to assist the divers when opening and/or closing the heavy hatch. It is imperative that the hatch is properly sealed before the bell comes to the surface. Thus, when closing the hatch, the Court accepts Blaauw's testimony that the divers look toward their feet at the rim of the hatch and O-ring when closing the hatch, to ensure that nothing gets caught in the opening, preventing a proper seal from being obtained, as well as Blaauw's testimony that he was looking toward his feet, clearing the area of obstructions, when he was struck in the eye, not the area above and behind the hatch where the bungee cord was presumably hanging. This testimony provides further support for crediting Blaauw's testimony that he did not see the bungee cord before the accident, and this Court's finding that his failure to see the cord was not unreasonable.

Superior also argues that, as the initial bellman on the date of his accident, Blaauw was responsible for reattaching or repositioning the bungee cord after the standby hat was initially

placed in service.  The Court cannot accept this argument.  Superior's argument assumes that, at the beginning of Blaauw's and Trice's bell run, the standby hat had been secured against the hull of the bell with a bungee cord.  However, both Blaauw and Trice testified that they did not remember if that was, in fact, the case.

Given the lack of a standard procedure for stowing the standby hat in any set location by any set means, and the inability of either diver to remember its exact position at the start of their bell run or the means by which it may, or may not, have been secured, the Court does not find that at the start of the bell run the standby hat was stowed using a bungee cord in a location which could have allowed the cord to snag on the hatch; it could have been stowed in another position or by another means.  The bungee cord therefore could have been hanging in the same position in which it had previously been left after the last bell run performed by the other two-man dive team.

Moreover, as Blaauw pointed out in his testimony, the Superior bell was a "'working diving bell' . . . not like a refrigerator where you go and you put something in there and four or five hours [later] you come back and get it in the same place."  To the contrary, the divers move about to access water, get food, change the sodasorb canisters and do other work in the bell.  At any time at which the bungee could have been moved, bumped or relocated.  Simply put, there is insufficient evidence for this Court to find that Blaauw left the cord hanging freely behind the hatch.

On June 16, 2006, Blaauw and Trice performed bell run number 31. The Superior Offshore Saturation Diving Manual calculates bell run times from initial bell lock-off until the final bell lock-on. The manual further provides that, for two man bell runs, the total bell run time should be planned not to exceed eight hours, and that each diver's lockout time should generally not exceed a maximum of four hours. Superior's diving supervisor, Ken Fechtler, confirmed that these provisions were designed to prevent fatigue, as did safety manager, Billy Bratkowski. The total time of bell run number 31, however, *was over nine hours*, because, after completion of the working phase of the bell run, which lasted over seven and one-half hours, the divers were ordered to perform a diver recovery drill. This drill, which Blaauw described as "extremely tiring" and which Fechtler agreed can be a "strenuous exercise", was begun just short of the eight hour total bell run limitation, at the direction of the dive superintendent on request of a company representative.

Indeed, Fechtler candidly admitted that he complained about doing the drill at the end of the bell run. He testified that had he been the superintendent, he probably would not have done the drill. Although Fechtler testified that he talked to both divers and that they were not tired, Blaauw unequivocally stated that he was "definitely" tired after the working phase of the bell run had been completed. Considering the amount of time expended during the working phase of the bell run and Blaauw's relative inexperience performing saturation dives, the Court finds Blaauw's testimony on this point credible. Moreover, the Court accepts Rickey Dean Walker's assessment that such fatigue increases diver inattentiveness to their surroundings, and Billy

Bratkowski's and Ken Fechtler's recognition that fatigue is a contributing factor to diving injuries.

The Court also accepts Rickey Dean Walker's testimony regarding the causes of dive related injuries and finds these causes, in combination, directly contributed to Blaauw's accident and resulting eye injury, namely, the cramped and crowded conditions existing in Superior's dive bell, the dim lighting inside the bell, the absence of a lifting mechanism for opening and closing the hatch, Superior's decision to extend the dive time beyond eight hours, increasing diver fatigue and inattentiveness, and Superior's failure to perform a JSA which would have revealed the hazards associated with having bungee cords in this bell, thereby eliminating this hazard prior to Blaauw's accident. The Court further agrees with Walker that, given the conditions existing in Superior's dive bell, bungee cords should not have been in Superior's dive bell, particularly where no procedures were in place to ensure the proper stowage of the bungee cords.

## CONCLUSIONS OF LAW-Liability

A claim of negligence under the Jones Act and a claim of unseaworthiness under the general maritime law are two separate and distinct claims. *Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir.1992).

## Jones Act

The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C. § 688; *Becker v. Tidewater*, 335 F.3d 376, 386 (5th Cir. 2003). "An injured person

claiming the benefits of the Jones Act . . . has the burden of establishing seaman status."

*Becker*, 335 F.3d at fn. 8 *citing Barrett v. Chevron, U.S.A., Inc*., 752 F.2d 129, 132 (5th Cir.1985), *Bernard v. Binnings Const. Co., Inc*., 741 F.2d 824 (5th Cir.1984) and *Billings v. Chevron U.S.A. Inc*., 618 F.2d 1108, 1109 (5th Cir.1980).

To determine if an individual worker is a seaman, and therefore entitled to the protections of the Jones Act, the Supreme Court has established a two-prong test. First, "an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission." *Becker,* 335 F.3d at 387 *quoting Chandris, Inc. v. Latsis*, 515 U.S. 347, 368, 115 S.Ct. 2172 (1995). Second, "a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both duration and nature." *Id.*

The Supreme Court in *Chandris* admitted that satisfying the first prong of the test is relatively easy: the claimant need only show that he "do[es] the ship's work." *Id*. at 387-388 *citing In re Endeavor Marine, Inc.*, 234 F.3d 287, 290 (5th Cir.2000). This threshold requirement is "very broad," encompassing "all who work at sea in the service of a ship." *Id. citing Chandris*, 515 U.S. at 368, 115 S.Ct. 2172.

The requirement of a substantial connection to a vessel is intended "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Becker*,

335 F.3d at 388; *Harbor Tug and Barge Co. v. Papai,* 520 U.S. 548, 555, 117 S.Ct. 1535

(1997).  As the Supreme Court has noted,

> [T]he total circumstances of an individual's employment must be weighed to
> determine whether he had a sufficient relation to the navigation of the vessels and
> the perils attendant thereon. The duration of the worker's connection to a vessel
> and the nature of the worker's activities taken together, determine whether a
> maritime employee is a seaman because the ultimate inquiry is whether the
> worker in question is a member of the vessel's crew or simply a land-based
> employee who happens to be working on the vessel at a given time.

*Id*. *quoting Chandris*, 515 U.S. at 370.

Importantly, this second prong constitutes a "status-based" standard; "it is not the

employee's particular job that is determinative [of seaman status], but the employee's

connection to a vessel." *Id*. *quoting Chandris*, 515 U.S. at 364.  The Court expounded on this

status-centric language, noting that it matters whether "the employee's duties take him to sea"

and that the Jones Act's coverage is confined to "those workers who face regular exposure to

the perils of the sea." *Id*. *citing Papai*, 520 U.S. at 555 and 560.

Accordingly, the Fifth Circuit has repeatedly conferred seaman status on commercial

divers because "the inherently maritime nature of the tasks performed and perils faced by his

profession, and not the fortuity of his tenure on the vessel from which he makes the particular

dive on which he was injured, that makes [the commercial diver] a seaman." *Wallace v.*

*Oceaneering International*, 727 F.2d 427, 436 (5th Cir. 1984); *Pickle v. International Oilfield*

*Divers, Inc*., 791 F.2d 1237, 1240 (5th Cir. 1986).  *See also Hall v. Professional Divers of New*

*Orleans*, 865 F.Supp. 363 (E.D.La. 1994); *Moore v. Sub Sea International, Inc.*, 1997 WL

779016 (E.D.La. 1997); *Webster v. Seahorse Fleet, Inc*., 637 F.Supp. 151 (W.D.La. 1991).

Superior contends that Blaauw was not permanently assigned to any particular vessel, or fleet of vessels, and is therefore not entitled to seaman status. The Court disagrees. As a commercial diver, Blaauw filled one of the Superior Endeavor's crew positions and engaged in the vessel's maritime work while on board, performing remedial work to offshore installations and pipelines damaged by Hurricane Katrina in the Gulf of Mexico. Further, it is undisputed that the Superior Endeavor is a vessel in navigation. Moreover, there is sufficient evidence to conclude that plaintiff was substantially connected to the Superior Endeavor, therefore warranting coverage under the Jones Act.

All of Blaauw's time offshore in the United States was spent in service of the dive support vessel, the Superior Endeavor. Blaauw was assigned to, sailed with, lived on and worked on the Superior Endeavor during two hitches. Blaauw's first hitch with the Superior Endeavor, working as a tender, rigger and deck foreman, lasted nearly four months. His second hitch, working as a saturation diver, was to last approximately the same amount of time; however, he was injured before completing his second hitch. Blaauw did no land-based work for Subtech or Superior in the United States, but rather his duties took him to sea where he was regularly exposed to the perils of the sea. Indeed, Blaauw was injured while performing a diving operation, during a time when he was in saturation, and not only exposed to the perils of the sea, but completely immersed in those perils. As such, Blaauw is a seaman entitled to the protections of the Jones Act.

An employer-employee relationship is a necessary element of a Jones Act Claim. *Addison v. Gulf Coast Contracting Services, Inc.*, 744 F.2d 494, 498 (5th Cir. 1984); *Baker v. Raymond International, Inc*., 656 F.2d 173, 177 (5th Cir. 1981). An injured worker may satisfy this element showing that, at the time of his injury, he was the borrowed servant of the defendant against whom recovery is sought. *Id*. "The borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer. It permits the injured worker to recover from the company that was actually directing his work. It may also determine which of the possible employers ultimately bears the cost of the injury." *Hall v. Diamond M Co.,* 732 F.2d 1246, 1249 (5th Cir. 1984) *quoting Baker*, 656 F.2d at 178.

Among the considerations for determining whether a servant has been borrowed by another employer are:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer;

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who has the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Hall,* 732 F.2d at 1249 *citing Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir.1977) and

*Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir.1969).

Although "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship . . ." the central question in borrowed servant cases is who has the power to control and direct the servant in the performance of his work. *Id. quoting Ruiz,* 413 F.2d at 312 and *citing Hebron v. Union Oil Co. of California,* 634 F.2d 245, 247 (5th Cir.1981); *see also Addison,* 744 F.2d at 499.

Superior contends that plaintiff has failed to establish the existence of a borrowed servant relationship, or more specifically, that Superior is Blaauw's borrowing Jones Act employer. The Court disagrees. Examination of the record before this court reveals that although Blaauw had contracted with Subtech, Subtech had no element of control over the actual performance of Blaauw's work aboard the Superior Endeavor. To the contrary, Blaauw was under the direction and control of Superior superintendents and Superior supervisors, Brad Boerner, Ken Fechtler and Jason Knox, who dictated the details of his day-to-day activities and gave Blaauw instructions for performing his job inside the bell, while Blaauw was undertaking Superior's work, aboard Superior's dive support vessel, using saturation diving equipment, including the dive bell and saturation system, furnished by Superior. Indeed, Knox was the person who advised Blaauw that, on his second hitch, he would be entering saturation as a

diver, rather than tending as he had done on his previous hitch, and it was Superior employees, Brian Trice and Ken Fechtler, who trained Blaauw on the proper running of the gas panels in the saturation system inside the bell and the procedure for performing the bell checklists.

The Jones Act employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, failure to inspect the vessel for hazards, failure to take precautions to protect a seaman or any other breach of the duty of care. *Davis v. Hill Engineering, Inc.*, 549 F.2d 314, 329 (5th Cir. 1977), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir.1997); Thomas J. Schoenbaum, Admiralty and Maritime Law, § 6-21 (4th ed. 2004).

The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338-339 (5th Cir.1997). "[T]he employer must have notice and the opportunity to correct an unsafe condition before liability attaches." *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989). "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" *Id. quoting Turner v. Inland Tugs Co.*, 689 F.Supp. 612, 619 (E.D.La.1988). *See also Pechawer v. Art Catering, Inc.*, 2007 WL 2127824, *3 (E.D.La. 2007).

"The fact that a certain practice has been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances. A long accepted practice may be an unsafe practice. However, a practice is not necessarily unsafe or unreasonable merely because it injures someone." Fifth Circuit Pattern Civil Jury Instruction 4.4 (1999).

The seaman bears the evidentiary burden of proving that a breach of a duty owed by the employer was a cause of his injuries. *See Davis,* 549 F.2d at 331, *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir.1997). The standard for causation in a Jones Act case is clear; "a defendant must bear responsibility for his negligence if such negligence played any part, even the slightest, in producing the injury" for which damages are sought. *Landry v. Oceanic Contractors, Inc.*, 731 F.2d 299, 302 (5th Cir. 1984) *citing Chisholm v. Sabine Towing & Transportation Co.,* 679 F.2d 60, 62 (5th Cir.1982); *In re Cooper/T Smith*, 929 F.2d 1073, 1076-1077 (5th Cir. 1991). Thus, the plaintiff's burden to prove causation is "very light" or "featherweight." *In re Cooper/T Smith*, 929 F.2d at 1076 *citing Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142 (5th Cir. 1975).

The plaintiff has more than met his burden here. In this case, Superior was negligent in failing to use reasonable care to provide Blaauw with a reasonably safe place to work, by failing to exercise reasonable care to inspect the dive bell and take reasonable precautions for the safety and protection of its divers by performance of a properly conducted JSA to recognize and eliminate the existence of the obvious danger and hazardous condition presented by the bungee cords in the crowded, confined, cramped and dimly lit space existing in Superior's dive bell, and by failing to provide Blaauw with a reasonably safe method of work, by failing to

have a set procedure outlining a reasonably safe location for, and method of, stowing the standby hat inside the dive bell, employing reasonably safe equipment, and by failing to have a set procedure for the stowage of the bungee cords when they were not in use, or in the alternative, using a safer method such as rope or line to secure items in the dive bell.

Moreover, Superior's negligence was the cause of Blaauw's eye injury. Superior knew that bungee cords were in its diving bell and should have known of the obvious dangers posed by these bungee cords in the confined and crowded, dimly lit space inside Superior's dive bell, given the stored energy existing in bungee cords and the likelihood of rapid recoil in the event a stretched cord is inadvertently released. However, Superior allowed this recognizable hazard to remain in the divers working environment, unabated.

The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. *Davis,* 549 F.2d at 331 overruled on other grounds by *Gautreaux v. Scurlock Marine, Inc*., 107 F.3d 331 (5th Cir.1997); *Jauch v. Nautical Services, Inc*., 470 F.3d 207, 213 (5th Cir. 2006).

A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances; such circumstances include not only his reliance on his employer to provide a safe work environment, but also his own experience, training, or education; the reasonable person standard, under the Jones Act, is one of the reasonable seaman in like circumstances**.** *Gautreaux,* 107 F.3d at 339.

Plaintiff asserts that his comparative negligence cannot be considered by this Court because Superior violated Coast Guard regulations which were enacted for plaintiff's safety, namely 46 C.F.R. § 197.200 (describing the purpose of the subpart), 197.400 (providing for the applicability of the regulations), 197.402 (setting forth the responsibilities of the Person in Charge), 197.404 (setting forth the responsibilities of the Dive Supervisor), 197.410 (regarding dive procedures), 197.420 (regarding operations manuals) and 197.328 (regarding illumination).

A Jones Act employer may be liable under the doctrine of negligence *per se*, if its violation of a statutory duty causes injury to its seaman-employee. In order to establish liability under the doctrine of negligence *per se*, the seaman must show the following: (1) a violation of a Coast Guard regulation, (2) the plaintiff's membership in the class of intended beneficiaries of the regulation, (3) an injury of a type against which the regulation is designed to protect, (4) the un-excused nature of the regulatory violation, and (5) causation. *Smith v. Trans-World Drilling Co.,* 772 F.2d 157, 160-61 (5th Cir.1985) *citing Reyes v. Vantage S.S. Co., Inc.,* 558 F.2d 238, 242-44 (5th Cir.1977), *modified,* 609 F.2d 140 (1980). *See also Fuszek v. Royal King Fisheries, Inc.*, 98 F.3d 514, 517 (9th Cir. 1996) *citing Smith, supra.* An employer's violation of an applicable safety statute designed to protect employees, which contributes to a seaman's injury, is liable for 100% of the seaman's damages, and any comparative negligence of the seaman may not be considered. *Roy Crook & Sons, Inc. v. Allen*, 778 F.2d 1037, 1043 (5th Cir. 1986); *see also Fuszek*, 98 F.3d at 517.

There is insufficient evidence to establish that Superior violated any of the cited regulations: 46 C.F.R. § 197.200, § 197.328, § 197.400, § 197.402, § 197.404, § 197.410 or § 197.420. Consequently, plaintiff has failed to establish that Superior was negligent *per se*. Plaintiff's comparative negligence may therefore be considered by this Court.

In this case, the Court finds that Blaauw was not negligent and that his damages should therefore not be reduced through application of comparative fault principles. Under the circumstances presented, Blaauw acted with ordinary and reasonable prudence as the Court would expect any other reasonable seaman to act in like circumstances.

**Unseaworthiness**

A Jones Act seaman may also sue the owner of any vessel on which he is working for a breach of the warranty of seaworthiness, regardless of whether the vessel is owned by his employer. *Becker v. Tidewater, Inc.,* 335 F.3d 376, 387 (5th Cir. 2003).

A shipowner has an absolute nondelegable duty to provide a seaworthy vessel. *Brister v. AWI, Inc.,* 946 F.2d 350, 355 (5th Cir. 1991). Accordingly, the seaworthiness issue is treated like a breach of warranty, rather than the narrower duty-breach inquiry for negligence. *Id. citing In re Cooper/T. Smith,* 929 F.2d 1073, 1077 (5th Cir.1991).

To prove that a vessel is unseaworthy, a plaintiff must prove that the defendant provided a vessel (including its appurtenances, gear, and equipment) not reasonably fit for its intended purpose. *Phillips v. Western Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir.1992).

Because the defendant's duty to provide a seaworthy vessel is completely independent of its duty to exercise reasonable care, the plaintiff does not have to prove the defendant was negligent. However, the plaintiff is required to meet a more demanding standard of proximate causation than is applicable to Jones Act claims. The plaintiff must show that the "unseaworthy condition played a 'substantial part' in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the vessel's unseaworthiness." *Phillips*, 953 F.2d at 928.

A vessel owner is not under a duty to provide an accident-free or perfect vessel. Rather, the vessel must be reasonably suited for its intended use. *Id. citing Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed 2d 941 (1960). Moreover, the fact that a device, such as the bungee cord in this case, is customarily used in the trade is not the legal measure of the duty of seaworthiness; to the contrary, a vessel is not proven seaworthy merely because the evidence shows that such devises are customary in the trade. *Little v. Green*, 428 F.2d 1061, 1066 (5th Cir. 1970) *citing Davis v. Associated Pipe Line Contractors, Inc.*, 305 F.Supp. 1345, 1349 (W.D.La.1968), *aff'd per curiam*, 418 F.2d 920 (5th Cir. 1969) and *June T, Inc. v. King*, 290 F.2d 404, 405 (5th Cir. 1961).

Unseaworthiness, like Jones Act negligence, can be the *per se* result of a regulatory violation. *Smith*, 772 F.2d at 162. However, to establish *per se* liability for unseaworthiness, the plaintiff must meet a more demanding standard of causation, that is, "proximate cause in the traditional sense." *Id*. As previously found, there is insufficient evidence to establish that

Superior violated any of the cited regulations: 46 C.F.R. § 197.200, § 197.328, § 197.400, § 197.402, § 197.404, § 197.410 or § 197.420. Consequently, plaintiff has failed to establish unseaworthiness *per se*.

The same factors set forth above that result in a finding of Jones Act negligence also make the DSV Endeavor an unseaworthy vessel. Superior did not provide Blaauw with equipment reasonably suited for its intended purpose nor was the equipment adequate to safely perform his assigned tasks. Specifically, unseaworthiness in this case arises from the use of the bungee cords in the cramped, crowded and dimly lit confined space existing in Superior's dive bell, to stow and secure the standby diver's hat. Moreover, the unseaworthy condition of the DSV Endeavor was the proximate cause of Blaauw's eye injury as that condition played a substantial part in bringing about, and actually causing, Blaauw's eye injury, which was both a direct result and a reasonably probable consequence of the vessel's unseaworthiness.

**General Maritime Law Negligence**

Finally, a Jones Act seaman may also sue third parties for general maritime law negligence. *Becker v. Tidewater, Inc.*, 335 F.3d 376, 387 (5th Cir. 2003) *citing Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

The standard for negligence under the general maritime law is essentially the same as that under general negligence law; accordingly, in analyzing maritime tort cases, courts rely on the general principles of negligence law. *Daigle v. Point Landing, Inc*., 616 F.2d 825, 827 (5th Cir. 1980). The plaintiff must demonstrate that there was a duty owed by the defendant to the

plaintiff, breach of that duty, injury sustained by plaintiff, and a causal connection between defendant's conduct and the plaintiff's injury. *In re Cooper/T. Smith*, 929 F.2d at 1077 *citing Thomas v. Express Boat Co.*, 759 F.2d 444, 448 (5th Cir.1985). Furthermore, the resultant harm must be reasonably foreseeable. *Id. citing Daigle*, 616 F.2d at 827.

In maritime personal injury cases, the plaintiff's comparative negligence may be considered, thereby reducing the plaintiff's damages by the percentage of fault found attributable to the plaintiff. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 408-409 and fn. 13, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (apportioning liability between plaintiff and defendant according to relative degrees of fault in a maritime collision case noting that a change in prior law in such cases would coincide with the "long since established" comparative negligence-proportional fault rule applicable in maritime personal injury actions).

Because this Court has found that, as a seaman, the plaintiff may recover for Superior's negligence under the Jones Act, analysis under the general maritime law is not required. Nevertheless, for those same reasons noted above with respect to plaintiff's Jones Act claim, the Court finds that, to the extent that plaintiff may not be deemed Superior's borrowed employee, he may nevertheless recover under the general maritime law of negligence. Superior owed Blaauw a duty to provide him with a reasonably safe working environment. However, Superior did not exercise reasonable care, or take reasonable precautions, for the safety and protection of the divers in order to provide them with a safe working place. Superior failed to perform a JSA on the presence and use of bungee cords in the dive bell and

failed to have a safe procedure and safe equipment for safely stowing the standby helmet or the bungee cords when not in use, given the confined and cramped space within the bell and the dim lighting in the area where the helmet was routinely stowed when two divers were preparing to, and/or attempting to, close the bell's hatch.  Plaintiff's eye injury was proximately caused by Superior's failure.

Finally, the resultant harm, a traumatic eye injury, was reasonably foreseeable. Although Superior may not have had any actual knowledge of prior accidents involving bungee cords, it clearly should have known of the obvious dangers posed by the use of these devices in confined and cramped, dimly lit spaces such as those existing in Superior's dive bell, given the stored energy existing in bungee cords and likelihood of rapid recoil in the event a stretched cord is inadvertently released.  Had a JSA been done on the bungee cords, Superior would have gained actual knowledge.  The failure to perform a JSA was Superior's decision.

## CONCLUSIONS OF LAW - Damages

Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.  Thomas J. Schoenbaum, Admiralty and Maritime Law, § § 5-15 and 6-18 (4th ed.2004); *Nichols v. Weeks Marine, Inc.*, 513 F.Supp.2d 627, 637 (E.D.La. 2007).

With the exception of awards for future pain and suffering, future losses (income and medical expenses) must be discounted to present value.  *Culver v. Slater Boat Co.*, 722 F.2d

114, 117 (5th Cir. 1983); Thomas J. Schoenbaum, Admiralty and Maritime Law, §§ 5-15.1, 2 and 3 and 6-18.2 and 3 (4th ed.2004); *see also O'Byrne v. St. Louis Southwestern Ry. Co.*, 632 F.2d 1285, 1286 (5th Cir. 1980). Future lost income must also reflect a judgment to net, after tax, value. *Id.*; *Norfolk & W. Ry. v. Liepelt*, 444 U.S. 490, 493-494, 100 S.Ct. 755 757-758 (1980).

Lost earning capacity in the past is usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial. Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.1 (4th ed. 2004); *Johnson v. Cenac Towing, Inc.* 468 F.Supp.2d 815, 834 (E.D.La. 2006).

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F .2d 114 (5th Cir.1983). In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value. *Id*. at 517; Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.2 (4th ed. 2004).

An award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in those activities which normally contribute to the enjoyment of life. Thomas J. Schoenbaum, Admiralty and Maritime Law, § § 5-15.3 and 6-18.4 (4th ed. 2004). These damages are not subject to precise measurement. *Id.* Any amount to be awarded for pain and

suffering depends to a great extent on the trial court's observation of the plaintiff and its subjective determination of a reasonable amount needed to achieve full compensation. *Hyde v. Chevron U.S.A., Inc*. 697 F.2d 614, 632 (5th Cir. 1983). An award for pain and suffering also depends on the facts of the particular case. *Allen v. Seacoast Products, Inc*., 623 F.2d 355, 364-365 (5th Cir. 1980) *citing Wiley v. Stensaker Schiffahrtsges*, 557 F.2d 1168, 1172 (5th Cir. 1977) and *Fruit Indus., Inc. v. Petty*, 268 F.2d 391, 395 (5th Cir. 1959), *overruled on other grounds, Gautreaux v. Scurlock Marine, Inc*., 107 F.3d 331, 1997 A.M.C. 1521 (5th Cir.(La.) Feb 28, 1997). Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-15.3 and 6-18.4 (4th ed. 2004).

The traditional rule that an injured party must mitigate damages is applicable under the Jones Act and general maritime law. *See Williams v. Reading & Bates Drilling Company*, 750 F.2d 487, 490 (5th Cir. 1985). The burden of showing that the injured party failed to minimize his damages rests with the defendant. *Kratzer v. Capitol Marine Supply, Inc*., 645 F.2d 477, 483 (5th Cir. 1981).

A seaman has a right to be treated by the physician of his choice, however, he cannot be reimbursed for overly expensive or unnecessary medical services. *Matter of Cooper/T. Smith Stevedoring Co., Inc*., 942 F.Supp. 267, 269-270 (E.D.La. 1996) *citing Rodriguez Alvarez v. Bahama Cruise Line, Inc*., 898 F.2d 312 (2nd. Cir.1990). The employer has the burden of showing that treatment is overly expensive or excessive. *Id*. at 270 *citing Alvarez*, 898 F.2d at 315 and *Caulfield v. A C & D Marine, Inc*., 633 F.2d 1129, 1133 (5th Cir.1981).

**FINDINGS OF FACT - Damages**

After being struck in his left eye, Blaauw was unconscious for approximately ten seconds. He could not be treated by a physician immediately, however, because he had to be decompressed from saturation. That process took almost three days, during which Blaauw was in pain and being treated with pain killers and eye drops, while wearing patches over both eyes.

Blaauw was first seen by Dr Serio, Superior's occupational physician. Dr. Serio referred Blaauw to consult with Dr. Joseph Guarnieri. Dr. Guarnieri, immediately referred Blaauw to Dr. Robert Ross, a specialist in retinal, vitreous, and macular diseases. Dr. Ross began treating Blaauw on June 19, 2006, and remains Blaauw's treating physician.

The Court assigns great weight to Dr. Ross' testimony and accordingly, accepts his conclusions and opinions summarized below.

Dr. Ross performed laser procedures and cryotherapy on Blaauw's left eye, and also administered steroid injections to that eye. Although Dr. Ross was able to save Blaauw's left eye, Blaauw has nevertheless essentially lost the use of the left eye. Human eyes are designed to work together so the brain can smoothly fuse their separate images into one clear and stable visual perception of an object; however, Blaauw's eyes no longer have this capability. Blaauw is legally blind, with no useful central vision in his left eye and not much of his peripheral vision intact. The damage to Blaauw's vision is permanent.

As a result of the condition of his left eye, Blaauw cannot return to commercial diving. In addition to hyperbaric dangers and underwater dangers, topside dangers preclude Blaauw

31

from working as a commercial diver. The hyperbaric environment also presents the risk of further damage to Blaauw's left eye; he is at high risk for compete detachment of his retina, which would require total removal of the eye. Because of Blaauw's monocular condition, Blaauw's reaction times are delayed, his spatial orientation and balance are off and he has lost his depth perception. Moreover, Blaauw's monocular status places him at a disadvantage if his right eye is compromised, even momentarily. Thus, Blaauw would be a danger to himself and others if he were to return to his prior occupation, either in a topside or undersea environment.

Although there may be other monocular divers who have been cleared as fit to dive, each diver's fitness to dive must be assessed on a person-to-person basis considering their personal job requirements, personal abilities and personal ocular deficits. Given Blaauw's deficits, occupational environment, occupational tasks and hazards associated with those tasks, however, Blaauw should not be eligible to return to commercial diving.

The Court also gives great weight to the testimony of Dr. David A. Youngblood, plaintiff's expert in occupational medicine sub-specializing in undersea and hyperbaric medicine, who has extensive experience with the commercial offshore diving industry. He, like Dr. Ross, opined that Blaauw should not be returned to work offshore as a commercial diver. Given Blaauw's visual deficits, Dr. Youngblood opined that Blaauw would constitute a hazard to himself and to his fellow workers, rendering him unfit for employment as a commercial diver in any offshore environment. The Court agrees.

Although Superior's expert, Dr. Frank Butler, testified contrary to Dr. Ross and Dr. Youngblood, the Court cannot accept Dr. Butler's testimony, and accordingly assigns no weight to Dr. Butler's opinions and conclusions. Dr. Butler never examined Blaauw and never discussed Blaauw's condition with his treating physician, Dr. Ross. Moreover, Dr. Butler admittedly has limited experience in the topside and undersea hazards of strictly commercial diving in the offshore oil industry, his experience having primarily been with the military. Finally, Dr. Butler's opinion in this case appears contrary to his published article which suggests that fitness to dive must be determined on a case by case basis, considering each diver's occupational circumstances, accumulated training and experience and the employer's medical-legal interests. These interests include expenditure of medical resources to determine dive fitness and workman's compensation liability, when there is a "very large pool" of candidates who do not need medical evaluation to be cleared to dive. Dr. Butler did not fully undertake this type of analysis in Blaauw's case. Given Dr. Butler's limited experience with hazards associated with offshore commercial diving, and given that Dr. Butler was not given a comprehensive list of Blaauw's job functions and did not discuss the obvious medical-legal issues present in a one-eyed diver, the Court discounts his opinions.

**Economic Losses**

Both Blaauw and Superior submitted expert reports from vocational rehabilitation counselors and economists, calculating Blaauw's past lost wages and future loss of earning capacity. With the exceptions listed below, the Court credits the net, after tax estimates of

Blaauw's expert economist, R. Douglas Womack, set forth in Table 10D attached to his trial deposition, calculated without Blaauw obtaining a college degree in the future.

The Court also accepts the testimony of plaintiff's vocational rehabilitation counselor, Glen M. Hebert, which is fully supported by the evidence adduced at trial, that Blaauw's economic losses should be based on the assumption that Blaauw be treated as a saturation diver earning saturation diver wages. At the time of his injury, Blaauw was working as a saturation diver and there is no credible evidence that, absent his injury, he would not have continued to be employed as a saturation diver in the future. To the contrary, the evidence suggests the opposite; as indicated in Brad Boerner's email, Superior was pleased with Blaauw's performance as a saturation diver and Superior was looking forward to Blaauw returning to work in that capacity.

Moreover, although Superior suggested that Superior's work has decreased since Hurricane Katrina, there is insufficient evidence in the record demonstrating that the work available in diving industry worldwide has decreased to a level that Blaauw would not have been able to find employment as a saturation diver, particularly given the fact that, absent his injury, under his B-1 OCS visa, Blaauw would have been able to obtain two years on-the-job experience with Superior in that capacity.

Finally, the Court cannot accept Superior's contention that Blaauw would not have been eligible for employment in the United States after expiration of his B-1 OCS visa and, therefore, Blaauw's future wages should be based on those of a South African diver. Despite

this contention, Superior continues to employ foreign national divers and is currently in the process of renewing visa applications for foreign nationals. There is insufficient evidence in the record to suggest that the Coast Guard will decline Superior's request, nor to suggest that these visas would not be renewed.

Moreover, there are numerous companies who have saturation dive vessels and, accordingly, employ saturation divers, and nothing in the record suggests that Blaauw would not have been able to obtain employment with any one of those companies as a saturation diver. Indeed, even Superior's Vice President of Human Resources, Robert Jamieson Wise, agreed that nothing would prevent Blaauw from working with any of these companies either in the United States or overseas.[3]

## Past Lost Wages

Blaauw is entitled to any wages that he would have earned had he continued to work as a saturation diver through the date of trial, less any wages that he earned since the accident.

On June 16, 2006, the date of the accident, Blaauw was earning $750.00 per day working as a saturation diver; he was to be paid $240.00 per day when working topside. The evidence supports a finding that, had Blaauw been able to continue his employment as a saturation diver, after one year of employment, Blaauw would probably have received an increase in his salary commensurate with his experience and the wages paid to other saturation divers. The Court finds that $900.00 per day is a reasonable estimate of that increase.

---

[3]There was evidence produced that wages for saturation divers in other parts of the world are both greater and lesser than the average in the Gulf of Mexico. The Court uses the Gulf of Mexico wage rate in this case since Blaauw was employed in the Gulf of Mexico at the time of this accident.

The Court accepts the testimony of Robert Jamieson Wise, Superior's Vice President of Human Resources, that the typical work schedule for foreign national divers, like Blaauw, was alternating thirty day rotations, topside on deck, in saturation diving, and topside on deck again, followed by a thirty day period off work. Although Blaauw had begun in saturation on his second hitch with Superior, the Court finds this was a deviation from the normal procedure which occurred under the particular circumstances presented at that time, and which was not likely to be repeated had Blaauw continued to work for Superior. Blaauw has returned to South Africa and is currently earning the equivalent of approximately $25,352.00 per year as a classroom instructor teaching diving.

Employing the above assumptions, Blaauw's expert economist, R. Douglas Womack, Ph.D., calculated Blaauw's past lost wages from the date of the accident to the date of trial, offset by his estimated earnings since the accident, as $130,117.00.[4] However, since Blaauw began in saturation immediately upon boarding the Endeavor, rather than working on the deck first (as Womack's calculations assume), Womack's past wage loss calculation should be increased by an additional $4,590.00, which represents the difference between starting the rotation on the deck and starting the rotation in saturation.[5] Accordingly, Blaauw will be awarded $134,707 in past wage loss.

---

[4] Dr. Womack did not testify live at trial. Rather, his testimony was presented via his trial deposition taken on February 29, 2008.

[5] Specifically, this figure represents the difference between working the remaining nine days in the first thirty day rotation post-accident in saturation (as opposed to topside on deck as Womack's calculations assume), followed by thirty days topside on deck (as opposed to thirty days in saturation), followed by thirty days in saturation (rather than thirty days topside on deck).

Dr. Womack added $5,966.00 for lost employer paid fringe benefits, namely 401(k) plan employer contributions and insurance benefits. However, as a South African, there is no evidence that Blaauw was entitled to participate in a 401(k) plan, and therefore the Court will not award any sum for loss of employer contributions. Moreover, there is no evidence that Blaauw received insurance benefits. Therefore, the Court will not award any sum for this alleged loss, either.

Both economists calculated a sum for Blaauw's lost meals while working offshore. Dr. Womack based his calculations on the retail cost of these meals, while Dr. Boudreaux apparently used the cost of meals served at home. The Court accepts Dr. Womack's calculations as those calculations are representative of the value of similar quality and quantity meals to that of the meals Blaauw lost while offshore. The Court therefore awards Blaauw $6,224.00 for past meals lost while offshore.

Based on the above, the Court finds that Blaauw has lost $140,931.00 in past wages and meals. Accordingly, the Court will award Blaauw this amount.

**Future Wage Loss**

Blaauw's expert economist, R. Douglas Womack, estimated that Blaauw's total work-life expectancy at trial was 29.93 years. The Court accepts this estimate.

However, the Court finds no credible evidence that, had he not been injured, Blaauw could have continued to be a saturation diver for the remainder of his work life. To the contrary, the testimony of the lay witnesses presented at trial establishes that, more probably

than not, saturation divers do not continue saturation diving once they reach mid-life. Rather, saturation divers continue their career in other capacities such as diving supervisors or diving superintendents. This finding is supported by the testimony of Brian Trice, Brad Anthony Boerner, Kenneth Ray Fechtler, Cecil Richard Thompson, and William Raymond Bratkowski, all of whom were previously saturation divers, but who have since moved into supervisory positions, well in advance of the end of their work life expectancy. This finding is further supported by testimony establishing the extreme conditions under which saturation divers must work, which the Court finds is not conducive to middle-aged personnel.

Mr. Wise's testimony established that saturation supervisors earn between $ 650.00 to $1000.00 per day, or in the range of $110,000 to $150,000 per year, depending on experience. That salary range is supported by the testimony of Brian Trice, who testified that, as a saturation supervisor, he is currently earning $650.00 per day. Mr. Wise further testified that if Blaauw had continued to work and stopped diving at age forty or forty-five, he could have become a saturation supervisor, earning, at the top end, $150,000.00 per year. The Court will use the mid-point, $130,000.00 per year, to award the loss of future earning capacity from age forty-five to the end of Blaauw's work-life.

For the reasons set forth above, the Court will award Blaauw the value of his lost meals while working offshore as calculated by Dr. Womack, but will not award, nor offset, any sum for lost employer paid fringe benefits (401(k) plan employer contributions and insurance benefits).

The plaintiff has a duty to mitigate his damages, including his future wage loss. Accordingly, the Court will offset the plaintiff's future wage loss by an amount which the plaintiff could reasonably earn in the future, given his training, education, transferable skills and additional training which plaintiff could reasonably undergo.

The plaintiff is a personable, articulate and motivated young man. He has military training and has led an active outdoor life. He obviously liked the diving industry, and the Court is convinced that he would likely have remained in this industry for the remainder of his work-life.

Defendant's expert in rehabilitation, Dr. Grimes, characterized the plaintiff's current employment as a dive instructor as a "good transition job". Grimes, did not believe that the plaintiff was "underemployed" at this time.

However, based on the testimony of Robert Jamieson Wise, Superior's Vice President of Human Resources, the Court finds that the plaintiff could, after additional training and the passage of some time to master the various job requirements, work as an onshore personnel manager or training manager. The uncontradicted testimony at trial indicates that these positions pay in the $60,000.00 range annually. Accordingly, the Court will use $60,000.00 per annum as the offset figure, and will use a period of six years for the plaintiff to train and progress to that level.[6]

---

[6]Six years was the projected time needed for the plaintiff to obtain a college degree. The Court finds that to be reasonable under the circumstances presented here.

Accordingly, using the discount rates and growth rates used by Dr. Womack, the Court finds that the calculations of Dr. Womack, set out in Table 10D of his report, attached to his trial deposition, are largely correct and the Court awards future wage loss as follows:

| | | |
|---|---|---|
| 1) Future Lost Earning Capacity | $2,543,891.00 | |
| 2) Residual Earning Capacity | $1,121,048.00 | |
| Difference | $1,422,843.00 | |
| 3) Loss of Future Meals Offshore | $97,206.00 | |
| Total Future Loss | $1,520,049.00 | |

**Future Medical Expenses**[7]

Both Dr. Ross and Dr. Butler agree that Blaauw will need future medical care. Dr. Ross testified that plaintiff's future medical expenses will be $7,106.00 per year (in present day dollars) for the rest of his life. There is no contradictory evidence in the record. Plaintiff's economic expert, Douglas Womack, Ph.D., testified that a growth rate of 6.5% was the average growth rate over the last 30 years in the United States for medical expenses. Defendant's expert, Dr. Boudreaux, testified that the United States Department of Labor statistics indicated a growth rate of doctor's fees to be approximately 1.5 %. Dr. Boudreaux expressed no opinion on the proper growth rate for medical services exclusive of doctor's fees. The Court will use Dr. Boudreaux's growth rate for the physician's fees, and Dr. Womack's growth rate for the other medical services, such as the testing and complex scans, that Blaauw will need.

---

[7]All of Blaauw's past medical expenses have been paid by Superior pursuant to its "cure" obligation.

Accordingly, the Court awards $511,168.00 in future medical expenses.

Plaintiff also seeks an award of $453,424.00 for travel expenses to the United States from South Africa four times per year for continued medical treatment by Dr. Ross. The Court concludes that Blaauw is not entitled to recover these travel expenses, as they are excessive and unwarranted. Blaauw has a duty to mitigate his damages. There is no evidence before this Court to indicate that Blaauw could not receive the same level of competent medical care from a physician in South Africa where he now resides. While Blaauw would like to continue treating in the United States with Dr. Ross, the physician of his choice, Blaauw may not do so at the defendant's expense. For these reasons, no award for travel expenses will be made.

**Pain and Suffering**

The evidence supports a finding that Blaauw suffered both mental and physical pain as a result of his left eye injury and that he is likely to suffer additional mental and physical pain in the future. As a result of his injury, Blaauw is legally blind in his left eye and has essentially lost the use of that eye. He initially endured the severe pain of having been struck in the eye, after which he lay in total darkness for almost three days awaiting medical attention, the entire time cognizant that he may have been blinded. He then endured the shock of being told by Dr. Ross that he was going to lose his eye, which, fortunately, was not the case. Blaauw also went through a series of painful laser and cryotherapy procedures to his left eye, while he was wide awake, which he described as having "somebody digging my eye out with a teaspoon." Blaauw currently has eye irritation and experiences an "uncomfortable", "scratchy feeling". He also

testified that he has concerns about losing his eye in the future.

Prior to his accident, Blaauw was an adventurous, active, resourceful and hard-working young man, who truly enjoyed diving and outdoor activities. However, as a result of the loss of vision in Blaauw's left eye, he is no longer able to engage in professional or recreational diving, and his other interests and activities are limited. He restricts his mountain biking to roads only, he no longer performs his "orienteering", he has had problems with his footing when rock climbing, and, on the sole occasion he tried hang gliding, Blaauw had to land on his "rear-end" to accommodate his disability. Blaauw's loss of vision, and resulting loss of hand-eye coordination, clumsiness and awkwardness, has also affected his daily activities. Blaauw has difficulty ascending and descending stairs and curbs, and in crossing the street. He also injured himself performing cabinetry work with his brother, when he drilled through his own finger. After observing Blaauw's demeanor when testifying about these changes at trial, and considering Blaauw's young age, the Court is convinced that these limitations will have a significant effect on Blaauw's future lifestyle.

The Court therefore finds that a fair and reasonable amount to compensate the plaintiff for his past, present and future pain and suffering and his past present and future inability to engage in those activities which previously contributed to the enjoyment of his life is $450,000.00 ($200,000.00 of which amount is attributable to the time prior to trial and $250,000.00 is allotted for the future). *See Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776 (5th Cir. 1996), *reversed in part on other grounds and reinstated in part*, 107 F.3d 331 (5th Cir.

1997) ($300,000.00 for pain and suffering to Jones Act seaman who lost an eye); *see also Reider v. State of Louisiana*, 897 So.2d 893 (La. App. 3rd Cir. 2005) ($400,000.00 for general damages to a ball park patron struck in the eye by foul ball causing permanent damage and blindness).

**PREJUDGMENT INTEREST**

"It is well settled that in an action at law under the Jones Act, the recovery of prejudgment interest is not permitted. *See Theriot v. J. Ray McDermott*, 742 F.2d 877 (5th Cir.1984). Nevertheless, the same rule does not apply to Jones Act cases brought under the court's admiralty jurisdiction, tried without a jury. Pursuant to the court's admiralty jurisdiction invoked under the Federal Rules of Civil Procedure 9(h), when a Jones Act case is brought under the court's admiralty jurisdiction, and the case is tried to the court and not to a jury, an allowance of prejudgment interest is within the discretion of the trial court, even if there is not a finding of unseaworthiness. *See Williams v. Reading and Bates Drilling Co.*, 750 F.2d 487 (5th Cir.1985); *Doucet v. Wheless Drilling*, 467 F.2d 336 (5th Cir.1972); *Bush v. Diamond Offshore Co.*, 46 F.Supp.2d 515, 523 (E.D. La. 1999); *In re Parish of Plaquemines as Owner of M/V Pointe-A-La-Hache*, 231 F.Supp.2d 506 (E.D.La. 2002). It is within the discretion of the Court to select an equitable rate of pre-judgment interest. *Harrison v. Diamond Offshore Drilling, Inc.*, 2008 WL 708076, *24 (E.D. La. 2008) *citing Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir.1991).

The Court finds that an award of prejudgment interest from the date of judicial demand (August 14, 2006) is appropriate in this case at the rate of 2.08 %, which is the most recently

quoted rate for one-year constant maturity treasury bills, on the plaintiff's past damages as a described above (past lost wages and past pain and suffering). *See Martin v. Walk, Haydel & Assoc.*, 794 F.2d 209, 212 (5th Cir.1986) (A district court may not award prejudgment interest on future damages).

**SUMMARY**

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff is entitled to recover the following damages:

| | |
|---|---|
| Past Lost Wages | $140,931.00 |
| Future Lost Wages | $1,520,049.00 |
| Future Medical Expenses | $511,168.00 |
| Past Pain and Suffering | $200,000.00 |
| Future Pain and Suffering | $250,000.00 |
| Total | $2,622,148.00 |

Because the Court did not find Blaauw contributorily negligent or at fault, the defendant will bear the entire cost of the judgement. Blaauw is entitled to pre-judgment interest on past damages from the date of judicial demand until the date paid, calculated at the rate of 2.08 %. Further, plaintiff is entitled to post-judgment interest at the legal rate on all remaining damages from the date of judicial demand until the date paid, as well as all taxable costs of court.

The parties shall submit a Judgment to the Court, approved as to form, in accordance with the above findings and conclusions **within seven (7) days**.

## MOTION FOR JUDGMENT AS A MATTER OF LAW

On February 25, 2008, Superior orally moved for Judgement as a Matter of Law. The Court advised that the motion would be considered after all of the testimonial depositions and evidence which form part of the plaintiff's case had been submitted. [rec. doc. 33]. Thereafter, Superior filed a Memorandum in Support of its previous oral motion, to which plaintiff has filed opposition. [rec. docs. 55 and 56]. The written Motion refers to FRCP 50, pertaining to judgments as a matter of law in cases tried by jury in which the Court is not the fact finder. However, the appropriate vehicle for dismissing a claim as a matter of law in bench trials is set forth in FRCP 52(c), which provides for entry of a judgment on partial findings. *See Weber v. Gainey's Concrete Products, Inc.*, 159 F.3d 1356, fn. 1, 1998 WL 699047, *1 fn.1 (5th Cir. 1998) (table); *Martin Midstream Partners v. Boone Towing, Inc.*, 207 Fed.Appx. 439, 440, 2006 WL 3431321, *1 (5th Cir. 2006) (unpublished); FRCP Advisory Committee Notes, 1991 and 2007 Amendments (noting that the Rule "parallels the revised Rule 50(a), but is applicable to non-jury trials" and that the "Amended Rule 52(c) refers only to 'judgment' to avoid confusion with a Rule 50 judgment as a matter of law in a jury case", respectively). Accordingly, this Court will treat Superior's motion as a Motion pursuant to FRCP 52(c).

Rule 52(c) provides as follows:

> If a party has been fully heard on an issue during a non-jury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim . . . that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

This Court adopts its findings of fact and conclusions of law set forth above in support of this Court's judgment in favor of plaintiff. Accordingly, Superior's Motion [rec. doc. 55] is **denied.**

## MOTION TO STRIKE

Plaintiff has filed a Motion to Strike portions of John W. Grimes' expert economic report and Kenneth Boudreaux's calculations based on Grimes' conclusions and trial testimony based on the standards for admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1983). [rec. doc. 42]. Superior has filed opposition, to which plaintiff has filed a Reply. [rec. docs. 48 and 63].

Initially, the Court finds the motion was untimely filed; the deadline for filing *Daubert* motions was October 24, 2007, and the instant motion was not filed until March 5, 2008.

Moreover, the purpose of *Daubert* is "to ensure that only reliable and relevant expert testimony is presented to the jury." *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 506 (5th Cir.1999) (superseded by rule on other grounds) *citing Daubert*, 509 U.S. at 590-93. Thus, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such as this where a . . . judge sits as the trier of fact in place of a jury." *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000). Further, "[a] judge in a bench trial should have discretion to admit questionable technical evidence, though of course he must not give it more weight than it deserves." *Wilson v. American Sec. Ins. Co,* 2008 WL 2704522, *1 (E.D.La. 2008).

Given the untimeliness of the motion, given the objectives of *Daubert* on which plaintiff's motion is premised, given that this case was tried as a bench trial, and given this Court's Findings of Fact and Conclusions of Law, the Motion to Strike is **denied** and alternatively**, dismissed as moot**.

THUS DONE AND SIGNED September 10, 2008, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE